**MATSUSHITA ELECTRICAL INDUSTRIAL CO., LTD.,**
Plaintiff,

v.

**CINRAM INTERNATIONAL, INC., Defendants.**

No. CIV.01–882–SLR.

United States District Court,
D. Delaware.

Jan. 5, 2004.

Steven T. Margolin, Esquire, Steven J. Balick, Esquire, John G. Day, Esquire, Ashby & Geddes, Wilmington, DE, Jeffrey L. Kessler, Esquire, David L. Yohai, Esquire, Adam C. Hemlock, Esquire, John P. Mastando III, Esquire, Kara R. Paldino, Esquire, Weil, Gotshal & Manges LLP, New York City, Matthew D. Powers, Esquire, Christopher J. Cox, Esquire, Jeffrey G. Homrig, Esquire, Joshua W. Andrews, Esquire, Weil, Gotshal & Manges LLP, Redwood Shores, CA, for Plaintiff/Counterclaim Defendant.

Jack B. Blumenfeld, Esquire, Donald F. Parsons Jr., Esquire, Mary B. Graham, Esquire, Karen Jacobs Louden, Esquire, Philip Bangle, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, M. Howard Morse, Esquire, David A.J. Gold-

fine, Esquire, Drinker, Biddle & Reath LLP, Washington, D.C.; Paul H. Saint–Antoine, Esquire, Amy B. Miner, Esquire, Drinker, Biddle & Reath LLP, Philadelphia, PA, for Defendant/Counterclaim Plaintiff.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

Matsushita Electric Industrial Co., Ltd. ("MEI") filed an action against Cinram International, Inc. ("Cinram") on December 20, 2001 for patent infringement of five patents related to optical information media, including digital versatile discs ("DVDs").[1] (D.I.1) Cinram agreed to license three of the five asserted patents on February 28, 2002.[2] (D.I.21) MEI, consequently, dismissed without prejudice its infringement claims for these patents.[3] MEI later withdrew a fourth patent from its suit against Cinram, and the parties stipulated to dismiss that patent in August 2002.[4] (D.I.44) At the same time, MEI amended its complaint to assert infringement of an additional patent.[5] (Id.) Thus, the present suit involves the alleged infringement of U.S. Patent Nos. 5,681,634 and 5,972,250 ("the '634 patent" and "the '250 patent," respectively).

MEI is a Japanese corporation with its principal place of business in Kadoma-shi, Osaka-fu, Japan. (D.I. 1 at ¶ 7) Cinram is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada and DVD production facilities in Canada, Europe, and the United States. (D.I. 8 at ¶ 44) The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). Presently before the court are the parties' numerous summary judgment motions relating to issues of invalidity, infringement, and bifurcation.

## II. BACKGROUND

### A. The Technology in General

The patents in suit relate generally to disk-shaped optical information media. ('634 patent, col. 1, 11. 8–9) Examples of this media include CDs, Laser Discs, DVDs, magneto-optical discs, Phase Change Discs, and optical cards and tapes. ('634 patent, col. 1, 11. 18–19; col. 11, 11. 6–7; col. 11, 11. 12–14) The media may be composed of a single substrate with a center hole as in the case of CDs. Alternatively, as in the case of DVDs, LaserDiscs, and magneto-optical discs, the media may be composed of two thin information substrates, each with a center hole, bonded together using a resin material. ('634 patent, col. 1, 11. 7–11) When only a single substrate is used, the media tend to bend due to weight. ('634 patent, col. 1, 11. 35–36) In contrast, the use of two substrates increases the mechanical strength of the media, thereby alleviating the potential for bending. ('634 patent, col. 1, 11. 36–41) Additionally, the use of two substrates doubles the storage capacity of the media because both substrates are available to record information. (Id.)

---

1. MEI originally alleged that Cinram infringed U.S. Patent Nos. 5,681,634; 5,790,487; 5,876,823; 5,881,032; and 6,226,446.

2. Cinram paid $4,871,799 dollars for the license and agreed to pay a running royalty of $0.05 for each DVD manufactured. (D.I.193, ex. 21)

3. MEI dismissed its claims concerning U.S. Patent Nos. 5,790,487, 5,881,032, and 6,226,-446.

4. MEI withdrew its suit as to U.S. Patent No. 5,876,823.

5. MEI amended its complaint to assert U.S. Patent No. 5,972,250 against Cinram.

The patents in suit address the specific problem of how to prevent resin from protruding into the center hole of the substrates during the bonding process. If such should occur, then resin may interfere with placement of the medium on the spindle of an optical information media player. ('634 patent, col. 2, 11. 55–58) The patents in suit solve this problem by including a "stopper" around the center hole to physically block the resin from reaching the center hole.

## B. The '634 Patent

The '634 patent claims both disk-shaped optical information media and methods of making such media. ('634 patent, col. 22–28) This patent was granted in the United States on October 28, 1997 and is titled "Optical Information Medium, and Method and Apparatus for Fabricating the Same." It was originally filed on February 9, 1996 and claims priority to three Japanese patent applications dating to February 15, 1995 and March 17, 1995. While the '634 patent includes forty-six claims in total, only claims 1, 2, 3, 6, 12, 18, 19, 41, and 43 are presently at issue.

## C. The '250 Patent

The '250 patent claims apparatus for making optical information media. ('250 patent, col. 22–24) This patent was granted in the United States on October 26, 1999 and is titled "Apparatus for Fabricating an Optical Information Medium." It is a divisional of the '634 patent and, therefore, has the same original filing date and priority information as the '634 patent. The '250 patent includes eight claims in total. Claims 1 and 5 are presently at issue.

## D. The Alleged Infringing Products

Cinram is a large, independent replicator of pre-recorded CDs, videocassettes, and DVDs for motion picture studios, music labels, publishers and computer software companies. (D.I. 197 at 6) In its manufacturing facilities, Cinram utilizes two brands of bonding equipment, the "Singulus" and the "Toolex–Alpha." (*Id.*) Cinram injects hot plastic into a mold cavity of either the Singulus or the Toolex–Alpha to form a substrate for use as either a CD or a DVD. (D.I. 201 at 9) A metal stamper is attached to the mold cavity. This metal stamper impresses the plastic substrate with an information carrying pattern commonly referred to as "pits and lands." (*Id.*) A holder fits into the center hole of the stamper to maintain the stamper in position during the injection and stamping process. The holder has lips that extend over the stamper and around the perimeter of the stamper's center hole. The lips invariably contact the substrate and form a mark on the surface of the substrate. This mark is referred to as the "stamper holder groove." (*Id.*).

## E. The 6C Pool

The DVD Forum is an international association of firms engaged in the research, development, manufacturing, or sales related to DVD technology. (D.I. 8 at ¶ 57) The DVD Forum was founded in 1995 by MEI under the name "DVD Consortium." (*Id.*) Around 1995, the DVD Forum agreed on specifications for the recording, production, replication, and use of both DVDs and DVD equipment (the "DVD Standard Specification"). (*Id.*)

After establishing the DVD Standard Specification, six members of the DVD Forum, namely MEI, Hitachi, Mitsubishi, Toshiba, JVC, and AOL–Time Warner, organized the "6C Pool" and entered an agreement to manage the intellectual property rights around their DVD patented technology (the "6C Pool Formation

Agreement").[6] (D.I. 8 at ¶ 62) Under the terms of the 6C Pool Formation Agreement, each member of the 6C Pool contributed one or more of its patents related to DVD technology to the pool to form a collection of patents "essential" to DVD production. (*Id.*) Each pool member acquired a cross-license to the other members' "essential" patents in exchange for its contribution. (D.I. 8 at ¶ 72) The members agreed as part of formation to offer a non-exclusive, non-transferable license to these pooled patents to non-member companies interested in replicating DVDs in compliance with the DVD Standard Specification. (D.I. 169 at 7) To this end, the members drafted a standard license agreement to facilitate licensing the pooled patents (the "6C Pool License"). (*See* D.I. 157, tab 1) Section 2.1 of the 6C Pool License specifically recites:

> Licensor hereby grants to Licensee and its Affliates a non-exclusive, non-transferrable license to make, have made, use, sell, and otherwise dispose of DVD Products under the DVD Patents or any of their claims pursuant to the Conditions of Exhibit 3.

(D.I. 157, tab 1 at § 2.1) Based upon this provision, a licensee of the 6C Pool acquires the right to practice all pooled patents "essential" to DVD production.

## III. STANDARD OF REVIEW

■ A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

■ If the moving party has demonstrated an absence of material fact, then the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed. R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the court must grant summary judgment if the party responding to the motion fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Omnipoint Comm. Enters., L.P. v. Newtown Township,* 219

6. IBM has since joined the 6C Pool. (D.I. 169 at 7)

F.3d 240, 242 (3d Cir.2000) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

## IV. DISCUSSION

### A. MEI's Motion for Summary Judgment That the Patents In Suit Are Not Invalid For Failure to Disclose Best Mode

Cinram alleges that the viscosity and temperature of the resin are part of the best mode for practicing the '634 and '250 inventions and that the '634 and '250 patents fail to disclose them. The best mode requirement of 35 U.S.C. § 112, ¶ 1. states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and **shall set forth the best mode contemplated by the inventor of carrying out his invention.**

35 U.S.C. § 112 (2002) (emphasis added).

■ "The purpose of the best mode requirement is to ensure that the public, in exchange for the rights given the inventor under the patent laws, obtains from the inventor a full disclosure of the preferred embodiment of the invention." *Dana Corp. v. IPC Ltd. P'ship*, 860 F.2d 415, 418 (Fed.Cir.1988). Consequently, the best mode requirement of § 112 "requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out the invention." *Bayer AG & Bayer Corp. v. Schein Pharms., Inc.*, 301 F.3d 1306, 1314 (Fed. Cir.2002) (citation omitted). "The existence of a best mode is a purely subjective matter depending upon what the inventor actually believed at the time the application was filed." *Id.* Because of this subjectivity, § 112 demands actual disclosure, regardless of whether practicing that mode would be within the knowledge of one of ordinary skill in the art. *Id.* Nevertheless, the extent of this actual disclosure is limited to the invention as defined by the claims. *Id.* at 1315.

■ In determining whether an inventor has disclosed the best mode, the Federal Circuit has adopted a two-step inquiry. First, the invention must be defined by construing the claims. *Id.* at 1320 (citing *Northern Telecom Ltd. v. Samsung Elec. Co.*, 215 F.3d 1281, 1286–87 (Fed.Cir. 2000)). The Federal Circuit has noted that "[d]efinition of the invention 'is a legal exercise, wherein the ordinary principles of claim construction apply.'" *Id.* It has also commented such definition "is a crucial predicate to the factual portions of the best mode inquiry because it ensures that the finder of fact looks only for preferences pertaining to carrying out the claimed invention." *Id.*

Once the claim analysis is complete, the finder of fact may proceed to the second step and apply the classic two-prong test. That is, the fact-finder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the claimed invention. *Id.* at 1320. If the inventor subjectively contemplated a best mode, then the fact-finder must evaluate whether the inventor's disclosure is objectively adequate to enable one of ordinary skill in the art to practice the best mode of the claimed invention. *Id.*

■ The Federal Circuit further has delineated that "if the best mode for carrying out the claimed invention involves novel subject matter, then an inventor must disclose a method for obtaining that subject matter even if it is unclaimed." *Id.* at 1322 (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 965 (Fed.Cir.

2001)). In other words, when the subject matter is unclaimed, but both novel and essential for carrying out the best mode of the claimed invention, disclosure is required. *Id.* With regard to unclaimed subject matter unrelated to the properties of the claimed invention, the Federal Circuit has acknowledged that an inventor need not disclose a mode for obtaining it. *Id.* (citing *Eli Lilly,* 251 F.3d at 963)

■ Viewing the facts in a light most favorable to Cinram as the non-moving party, the court finds that MEI has met its burden of showing that no genuine issue of material fact exists as to whether resin viscosity and temperature constitute a best mode for practicing the '634 and '250 inventions. The court appreciates that the first step in a best mode inquiry under *Bayer v. Schein* is to define the claimed invention. The '634 claims describe: 1) optical information media bonded sufficiently in the inner circumference and with structures to prevent resin from protruding into the center hole; and 2) methods for making such media. The '250 claims describe apparatus for manufacturing optical information media. The court finds that the '634 and '250 claims do not recite limitations regarding the viscosity of the resin or the temperature for the bonding process. Rather, the court finds the asserted claims only describe the **use** of a radiation curable resin. The viscosity and temperature of this radiation curable resin, therefore, are mere manufacturing details.

Moreover, the court notes that Cinram, in the face of this absence of material fact, is not able to offer any concrete evidence to show a genuine issue for trial. Cinram merely alleged that both resin viscosity and temperature are material to the operation of the '634 and '250 inventions because the asserted claims will not prevent resin from protruding into the center hole if viscosities and/or temperatures outside the

effective ranges are used. Nevertheless, the court is not persuaded by this argument given that the '634 and '250 inventions claim the use of resin, not the resin itself.

The court also agrees with MEI that no actual evidence exists to show that the inventors named on the '634 and '250 patents subjectively believed, at the time the applications were filed, that either a particular range of viscosities or a particular range of temperatures were better than others. In fact, the court notes that Dr. Michiyoshi Nagashima, one of the inventors named on both the '634 and '250 patents, stated in his deposition that he identified an effective range of resin viscosities in conjunction with a bonding process developed in 1992 through 1993 and that such process was not exactly the same as the one disclosed in the '634 and '250 filings made four years later. (*See* D.I. 191, tab 19 at 49–50; 53) On the basis of this testimony, the court concludes that Cinram improperly infers, without any evidence, that the viscosity range identified as best in 1992 did not change between 1992 and the filing of the '634 and '250 patents. Furthermore, concerning viscosity temperature, the court recognizes that Dr. Nagashima was not even part of the group of MEI personnel who conducted viscosity temperature research. (*See* D.I. 191, tab 19 at 58) The court, consequently, grants MEI's motion for summary judgment that the patents in suit are not invalid for failure to disclose best mode.

**B. MEI's Motion for Summary Judgment That the Patents–In–Suit Are Not Unenforceable Due To Inequitable Conduct**

■ As an affirmative defense to MEI's infringement charges, Cinram alleges that Dr. Nagashima committed inequitable conduct by intentionally withholding

five material prior art references (hereinafter "asserted references") from the U.S. Patent & Trademark Office ("PTO") during prosecution of the '634 and '250 patents. Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the PTO. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995); 37 C.F.R. § 1.56(a) (2003). The duty of candor, good faith, and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to the patent applicants or their attorneys which is material to the examination of the patent application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.1999). A breach of this duty constitutes inequitable conduct. *Molins*, 48 F.3d at 1178. If it is established that a patent applicant engaged in inequitable conduct, then the patent application is rendered unenforceable. *Kingsdown Med. Consultants v. Hollister Inc.*, 863 F.2d 867, 877 (Fed.Cir.1988).

■ In order to establish unenforceability based on inequitable conduct, a defendant must establish by clear and convincing evidence that: (1) the omitted or false information was material to patentability of the invention; or (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the PTO. *Molins*, 48 F.3d at 1178. A determination of inequitable conduct, therefore, entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570,

1578 (Fed.Cir.1995) (citations omitted). A reference, however, does not have to render the claimed invention unpatentable or invalid to be material. *See Merck v. Danbury Pharmacal*, 873 F.2d 1418 (Fed.Cir. 1989).

■ After determining that the applicant withheld material information, the court must then decide whether the applicant acted with requisite level of intent to mislead the PTO. *See Baxter Int'l, Inc. v. McGaw Inc.*, 149 F.3d 1321, 1327 (Fed.Cir. 1998). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for finding a deceptive intent." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed.Cir.1996). That is, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876 (Fed.Cir. 1988). A "smoking gun," however, is not required in order to establish an intent to deceive. *See Merck*, 873 F.2d at 1422.

■ Once materiality and intent to deceive have been established, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct. *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987). The showing of intent can be proportionally less when balanced against high materiality. *Id.* In contrast, the showing of intent must be proportionally greater when balanced against low materiality. *Id.*

■ Assuming for the sake of argument that the asserted references are material,[7] the court finds no evidence of record to show either that Dr. Nagashima knew of them or that he intentionally withheld them from the PTO. While Dr. Naga-

---

**7.** Cinram has failed to explain in its briefing why the asserted references qualify as material to patentability of either the '634 or '250 inventions.

shima directed MEI's Techno Research Department to search for Japanese patents relevant to his research,[8] Dr. Nagashima did not specifically review all of the results himself. (*See* D.I. 191, tab 19, vol. II at 13) Instead, the results were divided among a group of engineers. Each reviewing engineer, in turn, selected those patents. that he considered "important," based upon his individual judgment, to summarize for inclusion in a database. (*Id.*) Furthermore, Dr. Nagashima testified in his deposition that he did not know anything about the contents of the submissions to the PTO after the applications were originally filed. (*See* D.I. 191, tab 19, vol. II at 80) Dr. Slaten, Cinram's technical expert, even acknowledged in his deposition that he saw no actual evidence that Dr. Nagashima possessed any of the asserted references, knew their contents, or intentionally withheld them with an intent to deceive the PTO. (*See* D.I. 190, tab 17 at 383) The court, therefore, concludes that a jury would not be able to find that the patents in suit are unenforceable due to inequitable conduct. Accordingly, the court grants MEI's motion for summary judgment that the patents in suit are not unenforceable due to inequitable conduct.

## C. MEI's Motion for Summary Judgment That the Patents In Suit Are Not Invalid for Prior Art

Cinram alleges that seven prior art references ("prior art references")[9] explicitly or inherently anticipate or, alternatively, render obvious the patents in suit. Cinram also alleges that the "conventional fabrication process" shown in Figures 2A through 2D of the '634 and '250 patents anticipates or, alternatively, renders obvious the asserted patents.

### 1. Anticipation [10]

 A patent is anticipated under 35 U.S.C. § 102 if a single prior art reference explicitly discloses each and every limitation of the claimed invention. *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987). The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991). In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed.Cir.1995). The prosecution history and the prior art may be consulted if needed to impart clarity or avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. *Id.*

---

8. Dr. Nagashima focused the search on the patent publications related to "bonding" and classified in international search classification G11B7/24. (*See* D.I. 191, tab 19 at 54–56) He also limited it to companies that he considered major players in the field, namely Sony, Philips, Toshiba, Hitachi, and Pioneer. (*See id.* at 41–42)

9. These prior art references include: U.S. Patent No. 5,364,256, U.S. Patent No. 4,990,208, JPA No. 62–241436, JPA No. 63–63146, JPA No. 63–275052, JPA No. 5–20714, and DE No. 441199 A1.

10. The court notes that MEI raised additional arguments why the asserted claims are not invalid on anticipation grounds other than those discussed in the instant opinion. Those arguments, however, were premised on claim constructions not adopted by the court. Accordingly, the court concludes that they do not warrant consideration in the instant opinion.

A prior art reference also may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991). The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. *Id.* That is, "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* The Federal Circuit also has explained that "[i]nherency operates to anticipate entire inventions as well as single limitations within an invention." *Schering Corp. v. Geneva Pharms. Inc.*, 339 F.3d 1373, 1380 (Fed.Cir.2003). Recognition of the inherent limitation by a person of ordinary skill in the art before the critical date is not required to establish inherent anticipation. *Id.* at 1377.

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 714 (Fed.Cir.1998). Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent. *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed.Cir.1998)

The court finds that genuine issues of material fact exist regarding whether the prior art references expressly or inherently anticipate the asserted claims. MEI argues that the prior art references do not disclose: (1) the existence of a clamp region as recited in claims 1, 2, 3, 6, 18, 19, and 43 of the '634 patent; (2) "filling at least half of a clamp region with resin" as recited in claims 1, 2, 3, 6, 12, 18, 19, and 43 of the '634 patent; (3) the integral rotation of substrates as recited in claims 18, 19, and 23 of the '634 patent and claims 1 and 5 of the '250 patent; (4) the location of the ring-shaped groove as recited in claim 12 of the '634 patent; and (5) the use of a stopper as recited in claims 1 and 5 of the '250 patent. In contrast, Cinram presents lengthy tables showing how each prior art reference discloses every limitation of the asserted claims either expressly or inherently. (*See* D.I. 212) Moreover, despite MEI's allegations that Mr. Slaten stated that none of the prior art references expressly disclose every limitation of each asserted claim and that the missing limitations are not inherently present in the prior art, Cinram argues that Dr. Slaten did not make such admissions. Cinram asserts that Mr. Slaten, in fact, actually stated that the prior art references in some instances inherently disclosed the limitation at issue. On the basis of this conflicting evidence, the court believes that the issue of anticipation is both extremely complex and intensely fact specific. The court concludes that granting summary judgment would be premature and not based upon the most complete possible record. Consequently, the court denies MEI's motion for summary judgment that the patents in suit are not invalid on anticipation grounds.

### 2. Obviousness

To establish that a patent claim is obvious, clear and convincing evidence must exist to show that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103 (2003). The question of obviousness, therefore, turns on four factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicators of non-obvious-

ness, more commonly termed secondary considerations. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996). The existence of each limitation of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed.Cir.1999). "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id.* at 1356.

■■■■ To rebut a prima facie case of obviousness based on prior art, objective evidence of nonobviousness may be used. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.,* 192 F.3d 1353, 1360 (Fed.Cir.1999). This objective evidence includes: (1) a long-felt and unmet need in the art for the invention; (2) failure of others to achieve the results of the invention; (3) commercial success of the invention; (4) copying of the invention by others in the field; (5) whether the invention was contrary to accepted wisdom of the prior art; (6) expression of disbelief or skepticism by those skilled in the art upon learning of the invention; (7) unexpected results; (8) praise of the invention by those in the field; and (9) independent invention by others. *See Graham,* 383 U.S. at 17–19, 86 S.Ct. 684. "The *objective evidence of nonobviousness ...* should when present always be considered as an integral part of the analysis." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1393 (Fed.Cir.

1988) (quoting *W.L. Gore & Assoc. Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed. Cir.1983), cert. denied, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)).

■■■ MEI contends that Cinram has offered no evidence to show a motivation to combine any of the prior art references to achieve the inventions claimed in the '634 and '250 patents. MEI specifically notes that Mr. Slaten testified in his deposition that he found no motivation to combine any of the references he identified to produce the patented inventions. (*See* D.I. 190, tab 17 at 334–35) Even if such motivation existed, MEI argues that Cinram has not identified any combination of references that together disclose every limitation of claims 1, 2, 3, 6, 12, 18, 19 and 43 of the '634 patent and claims 1 and 5 of the '250 patent.

Cinram argues that MEI has drawn unwarranted inferences from Mr. Slaten's deposition testimony. Cinram argues that Mr. Slaten only stated that he was not aware of any **express** teaching in the '208 patent suggesting that it be combined with another reference. Cinram claims that MEI considered this statement and jumped to the conclusion that absolutely no motivation to combine any of the references existed. Additionally, Cinram argues that Mr. Slaten maintained in his declaration that the knowledge of a person of ordinary skill in the art at the relevant time would have provided the motivation to combine the pertinent references to make the claimed subject matter obvious. (See D.I. 272, tab 7 at ¶ 65)

Based upon Mr. Slaten's conflicting deposition testimony and declaration, the court finds that there is a genuine issue of material fact as to whether a motivation to combine the prior art references exists. Moreover, accepting Cinram's proposition that such motivation was based upon the knowledge of a person of ordinary skill in

the art, the court notes that neither party presents any evidence with respect to the level of knowledge of persons of ordinary skill in the art. The court also notes that the parties do not address any objective indicia of nonobviousness, which is integral to a thorough obviousness analysis. Accordingly, in light of the incomplete record, the court denies MEI's motion for summary judgment that the patents in suit are not invalid on obviousness grounds.

### D. Cinram's Motion for Summary Judgment That the Patents in Suit are Invalid for Indefiniteness; and MEI's Motion for Summary Judgment that the '634 Patent is Not Invalid for Indefiniteness [11]

■ A patent specification shall conclude with one or more claims that "particularly [point] out and distinctly [claim] subject matter which the applicant regards as his invention." 35 U.S.C. § 112, P 2 (2003). The Federal Circuit has explained that a claim satisfies section 112 paragraph 2 if one skilled in the art would understand the bounds of the claim when read in light of the specification. *See Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir.1993). In determining whether this standard is met, the Federal Circuit has advised that a claim is not indefinite merely because it poses a difficult issue of claim construction. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed.Cir.2001). Rather, the Federal Circuit has held a claim sufficiently clear to avoid invalidity on indefiniteness grounds "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." *Id.* "A determination of claim indefinite-

ness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir.1998). The Federal Circuit noted that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, [the court] accord[s] respect to the statutory presumption of patent validity, ... and [the court] protect[s] the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Id.*

■ Cinram argues that the terms "clamp region" and "center of a clamp region" are indefinite because the location of a clamp is dependent upon both the player or recorder in which the optical information media is used and the type of medium. Cinram also asserts that the phrase directed to filling "at least a half of a clamp region" with resin is indefinite because the claims fail to identify what volume should be filled with resin. The court finds that these arguments are not based on claim constructions adopted by the court. The court, therefore, concludes that the instant motion does not warrant further consideration in the instant opinion. Accordingly, the court denies Cinram's motion for summary judgment that the patents in suit are invalid for indefiniteness and grants MEI's cross-motion for summary judgment that the '634 patent is not invalid for indefiniteness.

### E. Cinram's Motion for Summary Judgment of Noninfringement of the '634 and '250 Patents

■ A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the

11. The arguments lodged by the parties in these two summary judgment motions are interrelated. The court, therefore, will address them collectively.

United States ... during the term of the patent." 35 U.S.C. § 271(a) (2003). A court should employ a two-step analysis in making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. *See id.* Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). The trier of fact must then compare the properly construed claims with the accused infringing product. *See id.* This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998).

██ Infringement may be shown under either of two theories: (1) literal infringement or (2) the doctrine of equivalents. Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. *See Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 n. 1 (Fed.Cir.1987). For there to be infringement under the doctrine of equivalents, the accused product or process must embody every limitation of a claim, either literally or by an equivalent. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 41, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). In other words, as clarified by the Federal Circuit, there can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device. *Pennwalt Corp. v. Durand–Way-*

*land, Inc.*, 833 F.2d 931, 935–36 (Fed.Cir. 1987) (en banc).

██ Equivalence is determined by applying the tripartite function-way-result test. Under this test, the Supreme Court has explained that a patentee may establish equivalency by showing that the accused infringing product " 'performs substantially the same function in substantially the same way to obtain the same result' " as the patented invention. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)(quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929)). Infringement under the doctrine of equivalents, therefore, requires a limitation-by-limitation inquiry. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

██ Cinram argues that it does not infringe the asserted patents because it does not use a stopper or any equivalent thereof to prevent resin from protruding into the center hole as required by the '634 and '250 patents.[12] In a declaration issued on September 16, 2003, Mr. Slaten explains that Cinram applies resin far from the center hole and utilizes a precisely controlled vacuum suction at the center of the disc to draw resin toward the hole and counter the centrifugal forces created by spinning the disc. (*See* D.I. 202) As a result, Mr. Slaten claims that the stamper holder groove does not qualify as the "stopper" limitation of the asserted claims, but is instead an "artifact" of the substrate manufacturing process.

---

12. In the conventional optical information media fabrication process, resin tends to protrude into the center hole. ('634 patent, col. 9, 11. 55–56; figs. 2A–2D) The '634 patent improved the conventional process by using a stopper to prevent the resin from protruding into the center hole. The specification discloses several forms of stoppers, including grooves and sealants.

MEI claims that it first became aware of Cinram's "vacuum theory" in its summary judgment motion filed on September 17, 2003, one day after Mr. Slaten's declaration. MEI argues that throughout discovery, Cinram unambiguously claimed that its manufacturing process creates a groove on DVDs for the purpose of preventing resin from reaching the center hole. Mr. Slaten admitted during a deposition on July 29, 2003 that Cinram practices claims 1, 2, 3, 6, 12, 18, 19, and 41 of the '634 patent and claims 1 and 5 of the '250 patent. (See D.I. 190, tab 17 at 218–222; 227) During a later deposition on August 26, 2003, Mr. Slaten again admitted that Cinram infringes claim 12 of the '634 patent. (See D.I. 190, tab 17 at 575–582) As such, MEI argues that the court should strike or disregard Mr. Slaten's declaration concerning the "vacuum" theory and exclude any other evidence supporting this theory.

The court agrees with MEI that Cinram introduced its "vacuum theory" much too late in the trial process. As MEI noted, Cinram had the opportunity to raise this argument throughout the course of discovery. Indeed, on June 6, 2003, the last day of fact discovery, Cinram responded to MEI's fourth set of interrogatories directed to all facts in support of Cinram's denial of infringement and did not disclose the "vacuum" theory. The court finds that it would be entirely unfair to MEI to allow this late introduction of a new non-infringement argument when trial is slated to begin in February 2004. Moreover, the court is not prepared to re-open the record in order to accommodate Cinram's new theory. Accordingly, the court denies Cinram's motion for summary judgment as to non-infringement of the '634 and '250 patents and excludes Mr. Slaten's declaration and any other evidence in support of this theory.

### F. Cinram's Motion for Summary Judgment That the Patents In Suit Are Essential and Therefore Licensed to Cinram and MEI's Motion for Summary Judgment that Cinram Is Not Licensed to Practice the '250 Patent [13]

As an affirmative defense to MEI's charge of infringement, Cinram asserts that it is licensed to practice the '634 and '250 patents under its 6C Pool License. In particular, Cinram claims that both patents are "essential" to the DVD Standard Specification under the terms of the 6C Pool License and, therefore, are included in the technology that it licensed from the 6C Pool. In order to be classified as "essential," a patent either: 1) is necessarily infringed when implementing the DVD Standard Specification; or 2) claims technologies for which there are not realistic alternatives when implementing the DVD Standard Specification, i.e., "essential as a practical matter." (D.I. 157, tab 1, ex. 3) With regard to the latter category, Mr. Kenneth Rubenstein, an independent expert for the 6C Pool who evaluates patents to determine whether they qualify as "essential," has explained that "a patent that has at least one claim covering a disc or a player, which claim is found to have no realistic alternative for implementing the DVD–ROM Standard (or a portion thereof), may be placed on the DVD–ROM essential disc or player list, respectively." [14] (D.I.193, ex. 9)

---

**13.** The arguments lodged by the parties in these two summary judgment motions are interrelated. The court, therefore, will address them collectively.

**14.** Mr. Rubenstein does not engage in an evaluation to formally declare a patent "essential" unless requested to do so by a member of the 6C Pool. (D.I. 197 at 8) Mr. Rubenstein has declared at last twenty-three patents submit-

### 1. The '634 Patent

■ Cinram claims that the '634 patent is "essential as a practical matter" because claim 14 [15] of the '634 patent covers all or nearly all of the DVDs sold in the United States that comply with the DVD Standard Specification (hereinafter "compliant DVDs") and has no realistic alternative.[16] Claim 14 uses a resin to glue two substrates together and requires the region adjacent to the center hole to be free of resin. Claim 14 recites:

An optical information medium comprising

[a] a first substrate having a center hole;

[b] a second substrate having a center hole, and

[c] a radiation curable resin interposed between the first and second substrates,

[d] wherein the radiation curable resin does not exist **in a region adjacent to the center holes** of the first and second substrates.

('634 patent, col. 23, 11. 20–26) (emphasis added)

The court finds that a genuine issue of material fact exists as to whether a resin-free region of some measurable size is **always** present in DVDs produced by M2 bonding machines.[17] To this end, the parties have presented cross sectional data concerning the size of the resin-free region on M2 DVDs. Cinram offers a cross-section showing a gap of fifty microns (i.e., the thickness of a piece of paper) between the center hole and the inner boundary of

---

ted by 6C Pool members to be "essential as a practical matter." (*Id.* at 9) To date, MEI has not requested Mr. Rubenstein to conduct this evaluation for the '634 patent or the '250 patent.

In deciding whether a patent is "essential as a practical matter," Mr. Rubenstein has used several factors including: (1) "the technical/commercial reason(s) why the invention claimed in the patent is the only practical way to implement part of the DVD–ROM standard;" (2) "the known alternatives to the invention claimed (if any), and why any alternative is not, or is no longer, used;" and (3) "preferably a study of all or nearly all of the products available in the market ... [that] demonstrates that substantially all (e.g. nearly 90% or more) of the market uses (i.e., infringes) one or more claims of the patent." (*See* D.I. 193, ex. 7) This court, however, is not bound by these factors and opts not to accord great weight to them since they are not explicitly enumerated in the 6C Pool License.

Because MEI has not submitted the patents in suit to Mr. Rubenstein for a formal determination of "essentiality," this court must render a decision in this regard. The court notes that its decision concerning "essentiality" is binding only upon the instant parties and that other jurisdictions may reach differ-ent conclusions. As a result, the patents in suit may be afforded inconsistent treatment across jurisdictions.

15. MEI did not assert claim 14 of the '634 patent against Cinram.

16. A compliant DVD must be made of two substrates, each with a center hole, bonded together by interposing a layer of glue between the substrates. The DVD Standard Specification also requires tight tolerances for the size of the center hole; it may be no less than 15.0 mm and no more than 15.15 mm.

17. M2 bonding machines utilize a different bonding process that other commercially available bonding machines. This process is known as the "Center Bond." (D.I.193, ex. 23) M2 bonding machines utilize a "boss" or spindle positioned in the center hole to distribute resin. (D.I. 197 at 17–18) Resin flows from the edge of the center hole toward the outer circumference of the disc. A synthetic, rubber-coated center hub then forms a seal with the substrate. The rubber coating expands and slightly bulges into the region between the two substrates. Because M2 DVDs are the only ones on the market that possibly may not infringe the '634 patent, they are the focus of the infringement analysis.

the resin. (*See* D.I. 197 at 18; D.I. 190, ex. 17 at 178) MEI offers other cross-sections (i.e., four cross sections from each of three discs) showing a resin-free region of fifteen microns (i.e., the thickness of a human hair). (*See* D.I. 197, ex. 17 at 175) At the same time, MEI points out that Mr. Slaten acknowledged that M2 equipment produces DVDs with resin in the center hole, and that Dr. Richard Zech, MEI's expert, likewise stated that M2 DVDs do not have a resin-free region. (*See* D.I. 190, tab 17 at 172, 181–182; D.I. 272, tab 18 at 60). To add further confusion to the mix, the court notes that the M2 operation manual states that "[d]iscs are bonded all the way to the center hole." Furthermore, the operation manual implies that the technology to position resin up to the center hole is patented. (*See* D.I. 193, ex. 24) Based upon this conflicting evidence of record, the court believes that it is premature to make a determination whether M2 DVDs infringe claim 14 of the '634 patent and that a more complete record needs to be established at trial.

Concerning whether M2 equipment is a realistic alternative if M2 DVDs are found not to infringe claim 14, the court finds that this issue may be disposed on summary judgment. Cinram did not offer any concrete, comparative data to show that M2 equipment cannot perform as well as other equipment in DVD manufacturing operations, despite the fact that both expert and fact discovery concluded prior to the instant motion. Rather, Cinram merely relied on the declaration of Marcel Tuchner, Cinram's Executive Vice President of Manufacturing and Engineering, who simply claimed that M2 bonding machines are not robust enough for realistic use in

its twenty-four hour per day, seven day per week DVD manufacturing operations. (*See* D.I. 198 at ¶ 6) The court is not persuaded by argument alone and notes a complete failure of proof as to Cinram's allegations. Accordingly, the court denies Cinram's motion for summary judgment that the '634 patent is essential and, therefore, licensed to Cinram on infringement grounds alone.

### 2. The '250 Patent

█ Cinram claims that the '250 patent is "essential as a practical matter" because there are no realistic alternatives to the DVD production apparatus disclosed in claim 1. Claim 1 recites, in relevant part:

> An apparatus for fabricating an optical information medium, comprising:
>
> means for applying a radiation curable resin to a first substrate, **while the first substrate is being rotated** ... wherein the resin is applied to a portion of the first substrate circumferentially outwardly disposed on the first substrate with respect to the stopper, to form a donut-shaped resin layer.

('250 patent, col. 22, 11. 16–23) (emphasis added)

Cinram argues that the Origin bonding machines practice claim 1 under the doctrine of equivalents. Origin bonding machines operate through the use of a rotating resin applicator that deposits a donut-shaped resin layer on a stationary substrate.[18] (*See* D.I. 191, tab 20 at 22–23) Cinram claims that Origin bonding machines satisfy the function-way-result test in that they perform the same function (i.e., depositing a donut-shaped resin layer) in substantially the same way (i.e., while the substrate rotates **relative to** the resin

---

18. Cinram also argued that Origin bonding machines literally fall within the scope of claim 1. This argument fails in light of the court's claim construction that the phrase "while the first substrate is begin rotated" means that the first substrate must be rotated while resin is applied.

applicator) to achieve substantially the same result (i.e., a donut-layer of resin on the first substrate) as the apparatus of claim 1. Cinram asserts that differences between a DVD bonding machine that rotates the resin applicator about a stationary substrate and one that rotates the substrate about a stationary resin applicator are insubstantial. Consequently, Cinram contends that Origin bonding machines satisfy the function-way-result test and infringe claim 1 of the '250 patent.

MEI refutes this position by arguing that Origin bonding machines do not satisfy the function-way-result test because they do not perform substantially the same function in substantially the same way as the "means for applying a radiation curable resin to a first substrate, while that first substrate is ... rotated." MEI points out that a rotating applicator, as found on Origin bonding machines, applies resin in a substantially **different** way than a stationary applicator. MEI also argues that, because of the different application techniques, the structure of a rotating applicator is entirely different than the structure of a stationary applicator.

Construing the evidence in Cinram's favor, the court agrees with MEI and finds that no reasonable juror could conclude that a rotating applicator as used on Origin bonding machines performs in the same way as a stationary applicator. The court also believes that Cinram misconstrues the law when it attempts to argue that the difference between a rotating applicator and a stationary applicator is insubstantial; Origin machines very clearly fail the limitation-by-limitation inquiry requisite to a doctrine of equivalents analysis. Moreover, the court notes it is of no consequence that Origin bonding machines perform overall in the same manner as the apparatus of claim 1. The Federal Circuit has stated that the mere showing that an accused device is equivalent **overall** to the claimed invention is insufficient to establish infringement under the doctrine of equivalents. See Warner–Jenkinson, 520 U.S. at 29, 117 S.Ct. 1040. On this basis, the court concludes that the function-way-result test for equivalency is not satisfied. The court, therefore, concludes that Origin bonding machines present a realistic alternative and that the '250 patent is not essential. Accordingly, the court denies Cinram's motion for summary judgment that the '250 patent is essential and, therefore, licensed to Cinram and grants MEI's motion for summary judgment that Cinram is not licensed to practice the '250 patent.

## V. CONCLUSION

For the reasons stated, the court grants MEI's motion for summary judgment that the patents in suit are not invalid for failure to disclose best mode; grants MEI's motion for summary judgment that the patents in suit are not unenforceable due to inequitable conduct; denies MEI's motion for summary judgment that the patents in suit are not invalid for prior art; denies Cinram's motion for summary judgment that the patents in suit are invalid for indefiniteness; grants MEI's motion for summary judgment that the '634 patent is not invalid for indefiniteness; denies Cinram's motion for summary judgment as to non-infringement of the patents in suit; denies Cinram's motion for summary judgment that the patents in suit are essential and therefore licensed to Cinram; and grants MEI's motion for summary judgment that Cinram is not licensed to practice the '250 patent. An appropriate order shall issue.

## ORDER

At Wilmington this 5th day of January, 2004, having reviewed papers submitted in

connection therewith, for the reasons stated;

IT IS ORDERED that:

1. MEI's motion for summary judgment that the patents in suit are not invalid for failure to disclose best mode (D.I. 186) is granted.

2. MEI's motion for summary judgment that the patents in suit are not unenforceable due to inequitable conduct (D.I. 184) is granted.

3. MEI's motion for summary judgment that the patents in suit are not invalid for prior art (D.I.182) is denied.

4. Cinram's motion for summary judgment that the patents in suit are invalid for indefiniteness (D.I.194) is denied.

5. MEI's motion for summary judgment that the '634 patent is not invalid for indefiniteness (D.I.219) is granted.

6. Cinram's motion for summary judgment as to non-infringement of the patents in suit (D.I.200) is denied.

7. Cinram's motion for summary judgment that the patents in suit are essential and therefore licensed to Cinram (D.I.196) is denied.

8. MEI's motion for summary judgment that Cinram is not licensed to practice the '250 patent (D.I.180) is granted.